# Glenn, Appellant, *v.* Trees et al.

*Appeals—Equity—Chancellor's findings of fact—Corporations—Sale of corporate property and property owned by others—Apportionment of price between corporations and individual owners—Accounting.*

1. The findings of fact by a chancellor have the force and effect of a verdict of a jury, and will not be disturbed on appeal if there is evidence to support them.

2. Where a stockholder or director takes part at a directors' meeting and has an opportunity and fails to inquire into the details of all matters of business admittedly transacted at the meeting, he will in a subsequent controversy, over these same business matters be concluded by his acts of participation.

3. Where, in the sale of oil lands, partly owned by the company and partly by individuals, a stockholder is present at a meeting wherein the articles of sale are approved, which provides for compensation in a lump sum, and the share the company is to receive has been stated, the stockholder, acquiescing in and voting for the sale, will not be permitted to complain afterwards that the company did not receive its full proportion of the purchase price.

Argued Oct. 13, 1922. Appeal, No. 147, Oct. T., 1922, by plaintiff, from decree of C. P. Allegheny Co., Jan. T., 1917, No. 2152, dismissing bill in equity, in case of Coulter E. Glenn v. J. C. Trees et al. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Bill in equity for accounting. Before FORD, J.
The opinion of the Supreme Court states the facts.
Bill dismissed. Plaintiff appealed.

*Error assigned,* inter alia, was decree, quoting it.

*John C. Bane,* with him *John A. Metz* and *Watson & Freeman,* for appellant.

*John O. Wicks* and *John S. Weller,* with them *James P. Eagleson, George J. Wolf* and *Smith H. Shannon,* for appellees.

OPINION BY MR. JUSTICE KEPHART, January 3, 1923:

To intelligently present our views, in addition to the facts that may be found in the record as presented at the former hearing, reported in 266 Pa. 74, these may be noted: The litigation involves the right of the individual defendants to take $1,850,000 for their personal use out of the proceeds of the sale of oil property, made through their instrumentality, to the Standard Oil Company. Plaintiff and his brother, after some dealings in oil properties in Illinois, went to Caddo Parish, Louisiana, where for some months they explored for oil locations. Later, leasing engagements were entered into with the three individual defendants, Trees, Benedum and Grayson. A company was incorporated, and all leases taken up, covering fourteen thousand acres, were transferred to this corporation. Grayson continued to secure leases in the State of Texas, close to if not adjoining those in Caddo Parish. These were offered to the company and refused. More than one hundred thousand acres were thus acquired by Grayson, who sold an undivided one-third to each of his associates, Benedum and Trees. Drilling on the company's land in Caddo Parish developed very valuable oil territory, which at the time of the sale had a daily yield of approximately seven thousand barrels. In June, 1910, the company, through its shareholders, formally resolved to sell its holdings for $4,000,000. This was predicated on a proposed option to be given one Barnes for $10,000,000, but was to include the individual holdings. No sale materialized from this effort, but, under the resolution, a sale was effected to one Bedford for the Standard Oil Corporation, above named, for $6,000,000, and completed in November of that year. It was approved by the company (defendant) in December, deeds were executed and the considera-

tion paid, the company receiving $4,150,000 as its share of the purchase price; the balance went to the individual defendants on account of their individual holdings.

It is because of this apportionment the present difficulty arises; the storm center hinges about plaintiff's knowledge of Grayson's acquisition of the Texas leases, the subsequent sale to his associates above named, his knowledge of the purpose of the June meeting, the terms of the contract presented to the meeting in December 1910, the price to be paid and its apportionment.

The court below found plaintiff consented to a sale of the property for $4,000,000, knew of the leases owned by the individuals, and was informed a prospective purchaser had inquired as to the price at which the properties of the company and the individuals could be bought, as it might be advisable to sell them jointly. When the agreement of sale was presented on December 3d for approval and confirmation, he was informed the consideration was to be $6,000,000, of which the company was to receive $4,000,000, the latter afterwards increased $150,000 to cover commissions, gratuities and other minor items. Plaintiff made no objection, protest or suggestion at the ratification meeting in December, and voted for the adoption of the resolution authorizing the sale. Based upon these and other material findings, the court below concluded as a matter of law that plaintiff and his brother, acting together, agreed to and were satisfied with the price and its apportionment; that they voted for the resolution authorizing the sale, after receiving the necessary information for intelligent action, being fully informed of the price to be paid, the terms of the contract, and the amount to be paid the company and the individual defendants; that they subsequently accepted their share of the sum received by the company and were concluded by their acts.

It has been consistently held, and is well known to counsel for appellant, that the findings of fact by a chancellor have the force and effect of a verdict of a jury, and

will not be disturbed if there is evidence to support them: Duffey v. Jennings, 247 Pa. 388, 391; Clothier v. Hoffman Co. et al., 261 Pa. 83, 87; MacDougall v. Citizens National Bank, 265 Pa. 170, 175; Scranton v. Scranton Coal Co., 256 Pa. 322, 327; Beaver v. Slane, 271 Pa. 317, 321. In certain stages of litigation, passing through different channels of our judicial system, juries and judges of the lower courts, as tryers of fact, must assume full responsibility in finally determining matters submitted through the evidence for their consideration, leaving to the appellate courts the duty of correcting such errors of law or procedure as may appear in the record. These rules of jurisprudence not only speed the termination of causes, but equalize the burden of judicial labors, impressing the public mind with the importance of the tribunal of first instance; they charge these officials with the grave responsibilities undertaken in performing such duties. There is an additional reason why the rule should be as it is. In ascertaining facts, contact must be had with the witnesses and much can be learned affecting credibility from their manner in testifying. This information cannot be reduced to matters of record.

The merits of the present controversy depend almost entirely on a consideration of disputed evidence, the scale inclining in favor of that deemed more credible; therefore the correctness of these conclusions on the merits must rest on findings of fact made by the chancellor. Able counsel have zealously prosecuted this cause, but, on appeal, it presents no unusual features differing from the many cases of like nature brought before us. It is quite true, in a general survey of the circumstances, there may be instances which at first blush might seem to have suspicious tendencies, but, when the record is read and analyzed, they disappear. We agree with the findings of the court below that the individual defendants (directors and majority stockholders in defendant company) were not guilty of any fraud in connection with the sale of this property. On plaintiff's

theory, it may be pertinently inquired why he as shareholder, and his brother as a director and shareholder of the company, did not, at the meeting of December 3d, demand the agreement of sale be presented, and, when not presented, why they were not given an opportunity to become familiar with its terms? Both were active business men, engaged in many undertakings, and should have had enough interest in the matter to have insisted on their rights. It will not do to answer, they did not wish to offend one of the individual owners (a director and one of the majority shareholders), for, if it would have been annoying to have then claimed their right, it is none the less annoying to enforce them in the present litigation. Had this been done, assuming plaintiff's statement correct, it certainly would have been less painful. Plaintiff did not hesitate a year or so later to assert those rights when he charged the same person with an unlawful division of treasury stock. At that time, all restraint was removed, and there was nothing to prevent him from acting, if he believed unfair dealing had been practiced. He waited for six years after the sale to test the bona fides of the apportionment of the purchase price.

The court below, however, found the agreement was presented at the meeting in December, and the terms were then made known to plaintiff. Appellant's counsel criticize the testimony of Benedum and its corroboration by Grayson, as it bears on the crucial facts. As we view it, the corroboration was ample, and we may add that Mr. Tree's testimony furnished a partial corroboration of Benedum's statements. The agreement bears internal evidence of like nature. Not only did it mention property of the company, but also that of Trees, Benedum and Grayson; there is now no dispute the company did not own an interest in the latter. The agreement contained an authority to receive and receipt for the purchase money; it was signed by company officials and the individual defendants. Without any explanatory reason, this authority to receive and receipt seems unneces-

sary if there was but one vendor; because there were more interests than one represented, the vendee wished to be relieved of all responsibility for a proper application of the purchase money as between different claimants. If there had been but one, a check to his order would have been sufficient. These facts, with the property of the individuals described and their personal joinder in the agreement, should have raised some question. The total sum was mentioned as $6,000,000; this would immediately cause inquiry, for it is claimed no other figure was mentioned but $4,000,000, conforming to the June resolution. The additional $150,000 was at best an effort on the part of the individual defendants to carry out the letter and spirit of this resolution. Commissions and gratuities were paid from it to employees. Under this latter, we may mention the check to McIlvaine.

The item of $230,000 appearing on the books and in some of the reports for taxation as part of the consideration, has been explained to the satisfaction of the court below, and we see no reason to criticize the conclusion reached. The method adopted to correct the error was not the best; others without erasure would have been sufficient. The court below no doubt considered each circumstance, and there was sufficient evidence from which to find, as was done, that it was not intended to permit this sum to remain in the treasury as a part of the purchase price. Nor are we persuaded that the reports filed for taxation purposes should change the conclusion. On the whole, we agree with the conclusion reached by the court below with respect to this item.

Counsel argue the land owned by the individual defendants was wildcat land, for which a small sum of money had been paid, and the big value producing the sale was the company's great oil wells on the Caddo Parish land. When these gentlemen went to Louisiana and Texas to locate oil properties, it was all pretty much a wildcat speculation. It was a searching expedition, with

no positive assurance; had dry holes been developed, the great burden of the expense connected with drilling would have fallen on these defendants. That it was subsequently successful does not change the original character of the undertaking. We are not impressed with the wildcat feature; the venture produced a wonderful property, and the parties received a handsome profit. This should not deprive plaintiff of his fair share of profits from the property sold, but if he had wanted to quarrel over the price he should have done so within a reasonable time after the deal was closed and the money paid; then was the time to assert the claim that the 103,-000 acres was wildcat land. We do not know what it has produced since; it lies in a very good location,—a well had been opened by the Gulf Company close to these lands,—and it is a fair assumption the land might at some places prove as valuable as that of the company. Without further prolonging our discussion, we conclude the chancellor's findings were amply warranted by the evidence; we are not convinced error was committed, nor, because of plaintiff's long silence, that any injustice has been done him or his brother.

One question remains. The court below found plaintiff and his brother agreed to and were satisfied with the apportionment. It is urged the pleadings do not set up an agreement. What the bill and answer clearly put at issue is the state of plaintiff's mind when he was made acquainted with the terms of the agreement, the consideration to be paid and its division,—that state of mind, expressed either in words of satisfaction, and acquiescence or acts indicating approval as evidenced by voting for the resolution authorizing the sale. It was not necessary, although certainly a better course, to reduce the matter to writing and have all parties sign it. This no doubt might have settled the question, but the omission to do so was not significant, in view of the findings of the court below that plaintiff was satisfied with the price. The evidence of agreement comes from what

plaintiff said and what he did at the meeting of December 3d, after being fully aware of all the facts. The pleadings were broad enough to admit such evidence, and to sustain the finding thereon; they were intended to bring out all these facts. It is immaterial by what name the condition may be called, whether agreement, satisfaction or the like; the pleadings cover the allegation that plaintiff knew and was satisfied,—particularly the eleventh, twelfth and thirteenth paragraphs of the answer.

There is no evidence in this record that plaintiff was ever prevented by defendants, or any one for them, from making inquiry desired of Bedford, or other persons, concerning any matter in connection with the transaction, either before, at or after the sale. The same method adopted by him six years later could have been adopted when the money was paid, or in 1912 after the break with Trees. The court below opened wide the doors for all manner of evidence, and defendants counsel seemed anxious to have the searchlight thrown on every phase of the investigation.

We have not considered in detail the many assignments of error, but have covered in our general discussion all we deem material.

The assignments are overruled and the decree of the court below is affirmed at the cost of appellant.